UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SOUTHERN FRUIT & VEGETABLE, INC.,

                              Plaintiff,

         -against-                                    Index # 10-9518

VEN-CO PRODUCE, INC, ROBERT VENUTI,
ANGELA VENUTI, GOTHAM BANK OF
NEW YORK, HUNTS POINT TERMINAL
PRODUCE CORPORATION
ASSOCIATION, INC., et al.,

                              Defendants.
-------------------------------------------------------------x

**SUPPLEMENTAL APPLICATION OF SOUTHERN FRUIT & VEGETABLE, INC. IN SUPPORT OF REQUEST FOR A PRELIMINARY INJUNCTION PURSUANT TO F.R.C.P. 65(b)(2) AND IN RESPONSE TO VEN-CO PRODUCE, INC., ROBERT VENUTI AND ANGELA VENUTI'S OPPOSITION THEREOF**

Southern Fruit & Vegetable, Inc. (the "Plaintiff"), submits this supplemental application in support of its request for a preliminary injunction pursuant to F.R.C.P. 65(b)(2) and in response to Ven-co Produce, Inc. ("Ven-co"), and Robert Venuti and Angela Venuti's (collectively, the "Venutis," and with Venc-co, the "Defendants") opposition thereof, and sets forth as follows:

1.     On December 21, 2010, the Plaintiff filed an application (the "Application") seeking, among other relief, a preliminary injunction (the "Preliminary Injunction") pursuant to F.R.C.P. 65(b)(2) enjoining the transfer of certain co-op units (the "Co-ops) pursuant to a certain sale transaction (the "Co-ops Sale Transaction") for $1.4 million dollars.

1

2.      On Friday, January 14, 2011, the Defendants filed opposition (the "Opposition") to the Plaintiff's Application.[1] The Defendants assert essentially two arguments in opposition to the Plaintiff's request for the issuance of the Preliminary Injunction of the Co-ops Sale Transaction: (i) a certain post-default document dated January 19, 2010 (the "January 19, 2010 Document") <u>may</u> terminate the Plaintiff's PACA trust rights, which in effect would make the Plaintiff a general non-PACA unsecured creditor of Ven-co; and (ii) the pending Co-ops Sale Transaction should not be disturbed because it is an "arms length *bona fide* transaction." The Plaintiff strongly disputes both of these arguments.

3.      While written post-default agreements that extend credit terms beyond 30 days may in fact terminate a PACA creditor's trust beneficiary rights, such agreement must actually be valid and binding.

4.      Where a party induces another to enter into a transaction by fraudulent misrepresentation, the transaction is voidable as against the fraudulent party. *See Goess v. A.D.H. Holding Corp.*, 85 F.2d 72, 74 (2d Cir. 1936). A promise made with a preconceived and undisclosed intention of not performing it constitutes a misrepresentation of material existing fact upon which an action for rescission may be predicated. *Sabo v. Delman*, 3 N.Y. 2d 155, 160 (N.Y. Ct. App. 1957) (*additional citations omitted*). Courts look to whether a party makes "specific affirmations" of that which ought to be done, with knowledge that no such thing will be done. *See Sabo v. Delman*, 3 N.Y. 2d at 160; *See also Channel Master Corp. v. Aluminum Limited Sales, Inc.*, 4 N.Y. 2d 403, 408 (N.Y. Ct. App. 1958).

---

[1] The Defendants filed and served their Opposition on the business day before the hearing on the Plaintiff's Application, which is presently scheduled for January 18, 2011, at 2:30 p.m.

5.      A distinction must be made between a business debtor and its principles genuinely seeking alternative terms to repay lawful debts to creditors, as opposed to savvy business debtors and their principals inducing PACA trust beneficiaries under false pretenses to sign documents that could later be used as a shield and a sword asserting that they waived their PACA trust beneficiary rights.

6.      From April 2009 through May 2009, Ven-co accrued the underlying debt from the sales of produce, which remains due and owing to the Plaintiff. *See* the invoices attached to the Affidavit of Keith Sherrill in support of the Plaintiff's Application.

7.      Approximately seven (7) months later, on January 19, 2010, the Defendants drafted the January 19, 2010 Document, expressly representing to the Plaintiff that it would make a $25,000 payment "ASAP", and provided it to the Plaintiff. The January 19, 2010 Document specifically affirms and states: "We agree that Ven-Co Produce Inc. will pay $25,000 ASAP and the balance of the money due over the next four or five months."

8.      The Defendants did not make **any** payment as they affirmatively represented in the January 19, 2010 Document.

9.      Also, from September 2009, through the present, Ven-co has been involved in defending an action initially brought by Northeast Trading, Inc., a PACA creditor, alleging over $325,000 in outstanding PACA claims from invoices from May 2009 through July 2009.  This matter is Northeast Trading, Inc. v. Ven-Co Produce, Inc., et al., case number 09-CV-7767 (the "Northeast Trading, Inc. Case"), which is presently pending in the United States District Court for the Southern District of New York.  At least one additional creditor, H.C. Schmieding Produce Co., Inc., moved to intervene

3

under Federal Rule of Civil Procedure 24 in the Northeast Trading, Inc. Case, and asserted outstanding PACA claims for invoices from March 2009, which as of October 2010, at least in part, remain unpaid.

10.     Under PACA, all PACA trust creditors are entitled to share in distributions from the PACA trust, and an individual produce seller that receives funds therefrom may be required to return the funds back into the PACA trust. *See Fresh Kist Produce, LLC v. Choi Corp.*, 223 F. Supp. 2d 1 (D.C. Dist. Col. 2003).

11.     The complete non-payment under January 19, 2010 Document coupled with the PACA claims asserted by parties in the Northeast Trading, Inc. Case indicate that Ven-co did not have the intent or ability to legitimately make payment to the Plaintiff when it provided the January 19, 2010 Document to the Plaintiff.

12.     At a bare minimum, a strong inference arises from the complete default of, as well as the facts and circumstances relating to, the January 19, 2010 Document, that it was based upon fraudulent misrepresentations by the Defendants, rescindable and/or void, of no bearing to the Plaintiff's PACA trust rights, and the Plaintiff's PACA trust beneficiary claims are valid.

13.     Moreover, the determination as to whether the January 19, 2001 Document is based upon fraudulent misrepresentations, rescindable and/or void is not before the Court at this time.   However, *arguendo*, even if the January 19, 2010 Document were to be deemed non-fraudulent or valid, the Plaintiff would still be a creditor of Ven-co, and therefore, entitled to the relief sought upon the Application.

4

14.    As a creditor, the Plaintiff is a party in interest with standing separate and apart of that of a PACA creditor, to seek that Ven-co's assets be sold in an arms' length *bona fide* transaction that will inure to the benefit of all creditors.

15.    In fact, N.Y. DEBT & CRED. § 273, sets forth: "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without fair consideration."[2] N.Y. DEBT & CRED. § 273.

16.    While the Defendants' Opposition sets forth that the Co-ops Sale Transaction is a *bona fide* arms' length sale transaction, the Defendants' Opposition does not list **any** marketing efforts, solicitation for or analysis of competing bids, or include a copy of an appraisal or other documentation that the Defendants relied upon in determining a fair market sale price for the Co-ops.

17.    Furthermore, attached as Exhibit "A" is a sworn statement by Sheldon Nathel of Nathel & Nathel, Inc.,[3] dated December 10, 2010, which the Plaintiff has recently received, and indicates (i) bids were not openly solicited, (ii) on or about October 4, 2010, Nathel & Nathel, Inc. made an offer to the Defendants for $1.7 million cash,[4] and (iii) Nathel & Nathel, Inc. is ready, willing, and able to purchase the Co-ops for $1.7 million. [Emphasis added].

---

[2] The underlying purpose of N.Y. DEBT & CRED. § 273is to permit a creditor to establish his debt, whether matured or unmatured, and to challenge a conveyance in a single suit, whether the creditor has obtained judgment or not. *See Allen v. Mattison*, 14 N.Y.S.2d 711 (N.Y.S. 1939). Accordingly, the fact that the Plaintiff's PACA trust claims are pending, even if disputed by the Defendants, should have no bearing on whether the Plaintiff should be able to challenge the Co-ops Sale Transaction at this time.
[3] Nathel & Nathel, Inc. is a produce distributor located in the Hunts Point Market at 357 Row C, New York City Terminal Market, Bromx, NY 10474.
[4] It should be noted that the Opposition does not indicate the date of the negotiations or execution of the pending contract for sale of the Co-ops.

18.     Accordingly, it appears that a substantially higher and better offer exists and has existed since October 4, 2010, and the Co-ops Sale Transaction likely constitutes a fraudulent conveyance. The Plaintiff intends to amend its complaint to include additional causes of action for fraudulent conveyances under New York Debtor and Creditor law.

19.     Notably, under PACA, the principals of an entity with PACA liability may be personally liable for PACA trust claims. *See* 7 U.S.C. § 499(e).

20.     At this time, there are competing claims between several PACA creditors, including, among others, Gotham Bank of New York. *See* the Affidavit in Opposition, at page 2, paragraph 6, where the Defendants mention a PACA claims procedure for "the entire PACA body."

21.     To the extent that PACA creditors' claims are subordinated to other creditors, the Venuti's may face personal liability for deficiencies on PACA claims.

22.     Despite the actual risk of personal liability, the Venutis are seeking to sell in the Co-ops for $300,000 or 22% less than Nathel & Nathel, Inc. has offered, raising serious doubts as to the *bona fides* of the Co-ops Sale Transaction.

23.     An arms' length transaction for the sale of the Co-ops to a bidder with the highest and best offer is in the best interest of all parties, including the Venutis.

24.     In the event that no higher and better offer exists or is made, the Plaintiff shall withdraw its request for the Preliminary Injunction, request that the proceeds of a sale be held in escrow pending a determination of the competing claims to the proceeds, and shall reserve all rights in connection with its claims.

25.    To the extent that a higher and better offer exists, the Co-ops Sale Transaction should not be permitted.


                                          Respectfully submitted,

Dated: January 17, 2011
       New York, New York

                              By:   /s/ Edward E. Neiger
                                    Edward E. Neiger, Esq.
                                    Jonathan S. Bodner, Esq.
                                    NEIGER LLP
                                    317 Madison Avenue
                                    21st floor
                                    New York, New York 10017
                                    Tel: 212.267.7342
                                    Fax: 212.918.3427

# EXHIBIT "A"

 **, INC.**



XXXX

**FRUIT AND VEGETABLES**

*SHIPPERS*
*RECEIVERS*
*COMMISSION MERCHANTS*

TEL: (718) 991-6050
FAX: (718) 378-1378

357 ROW C
NEW YORK CITY TERMINAL MARKET
BRONX, N.Y 10474

Sent via facsimile 908 – 638 – 4432

Mark Mandell                                                              Dec. 10, 2010
42 Herman Thau Road
Annandale, N.J. 08801

Dear Mr. Mandell,

I Sheldon Nathel have been informed that a sale has been concluded on the Venco units
at the New York City Terminal Produce Market.

Contrary to custom at the New York City Terminal Produce Market when a company
closes its doors (ceases operations) there were no bids solicited from interested
cooperators.

Nathel & Nathel, Inc. would have and stands right now to bid $1.7 million all cash.

I have made this offer to Robert Venuti & Angela Venuti on or about Oct.4th 2010 at a
dinner meeting exclusively to discuss the sale of the Venco Units. I told them at this
meeting I would pay $1.7 million for the units, all cash. Robert Venuti's response to me
at this meeting was he will think about it and contact me shortly.

After this meeting I had continuously followed up with Mr. Venuti but he was slow in
returning calls & when he did he would tell me that there are other things in the mix
which he could not discuss.

I had made a firm offer of $1.7 million all cash in the beginning of Oct. 2010 and make
the same offer today. Why my offer was rejected and Mr. Venuti decided to sell his units
for $1.4 million is a mystery to me.

Cordially,

Sheldon Nathel
Vice President & Secretary

SWoRn To before me
This 10th day of Da. 2010

9/10/14